2393

Betty BRAGG, as Personal Representative of the Estate of James Bragg, Appellant v. HI-RANGER, INC., Respondent.

(462 S.E. (2d) 321)

Court of Appeals

---

*Rodney M. Brown,* of *Younts, Alford, Brown & Goodson,* Fountain Inn, *for appellant.*

*Frank H. Gibbes, III* and *Stephanie Burton,* both of *Gibbes & Clarkson,* Greenville, *for respondent.*

Heard Apr. 3, 1995.

Decided Sept. 18, 1995.

CURETON, Judge:

This is a products liability case. Betty Bragg, as the personal representative of the Estate of James Robert Bragg (collectively referred to as "Bragg"), brought this action against the manufacturer of an aerial device, Hi-Ranger, Inc. (Hi-Ranger), and the distributor of the aerial device, Power Equipment Company, alleging claims based upon strict liability, implied warranties, and negligence.[1] Hi-Ranger filed a general denial to the action and put forth the following defenses: (1) contributory negligence, (2) assumption of the risk, (3) intervening negligence, (4) substantial change in condition of the product after its sale, (5) open and obvious danger, and (6) misuse of the product pursuant to South Carolina Code Ann. § 15-73-20 (1976). During the trial, Hi-Ranger moved for a directed verdict on all causes of action. After the conclusion of Bragg's case, the trial judge partially granted Hi-Ranger's motion and dismissed Bragg's claims based upon strict liability and warranty. He denied the motion for directed verdict on the negligence cause of action. The case went to the jury on the negligence claim and the jury returned a verdict in favor of Hi-Ranger. Bragg appeals the court's ruling on the directed verdict motion and several portions of the jury charge.[2] We affirm.

## Scope of Review

It is axiomatic that a trial court must view the evidence and all reasonable inferences to be drawn from it in the light most favorable to the party opposing a motion for directed verdict. If more than one reasonable inference can be drawn from the evidence, the court must submit the case to the jury. *Fleming v. Borden Inc.*, 316 S.C. 452, 450 S.E. (2d) 589 (1994). However, where the only reasonable inference from the evidence is that there has been a failure of proof as to a material element of the plaintiff's cause of action,

---

[1] During the course of the trial, Bragg and Power Equipment Company entered into a settlement agreement and Power Equipment Company was dismissed from the case.

[2] Bragg does not contend on appeal that the trial judge improperly granted Hi-Ranger's motion for directed verdict with respect to the breach of warrant claims.

it becomes the duty of the court to resolve the issue against the party having the burden of proof by directing a verdict. *Horton v. Greyhound Corp.*, 241 S.C. 430, 128 S.E. (2d) 776 (1962).

## Facts

James Robert Bragg was employed by Y.C. Ballenger Electrical Contractor, Inc. as a lineman. Ballenger is a large electrical contractor which performs work primarily for Duke Power Company. On June 25, 1990, James Bragg and his partner, Scott Rogers, were involved in a pole change-out procedure of Duke Power working in an aerial bucket truck on energized power lines. Bragg and Rogers were moving electrical lines from a lower pole to a newer and higher pole. The aerial device, which is affixed to a truck, was manufactured by Hi-Ranger.[3] The aerial device was equipped with quick-disconnect couplings near the bucket. The couplings permit hydraulic tools to be connected at the bucket for use by workers standing inside the bucket. The couplings also seal off or stop hydraulic fluid from flowing once the hydraulic tool is disconnected.

Bragg was using a hydraulic impact wrench to assist him in his work. This hydraulically driven wrench was being fed hydraulic fluid under pressure by two hoses. Rogers was on the ground. Rogers testified he heard "a little pop or something" and then heard Bragg yell to turn the truck off. Rogers jumped in the back of the truck to turn off the hydraulic fluid that ran through hoses located along the boom. The aerial bucket was on fire and Bragg jumped out of it. Bragg died several days later from injuries sustained in the fall.

Shortly before the accident, a Ballenger maintenance mechanic replaced the tool hose on the bucket. The tool hose was orange, but the mechanic improperly replaced it with a black hose. The black hose was a conductive as opposed to a nonconductive hose. The aerial bucket caught fire when the conductive tool hose attached to the impact wrench came in contact with more than one energized power line. Several linemen

[3] Hi-Ranger sold the aerial device in 1984 to its distributor, Power Equipment Company. Power Equipment affixed the aerial device to a chassis manufactured by General Motors and sold the unit to Ballenger in early 1985.

testified they knew that only nonconductive hoses should be used on the aerial bucket, but they did not know an orange hose was nonconductive and a black hose was conductive.

At trial, Bragg presented two expert witnesses. The first was a retired mechanical engineer who was declared an expert in mechanical engineering and hydraulics. Bragg's case depended largely upon this expert and she endeavored to use this testimony to establish a jury issue as to whether the use of standard quick-disconnect couplings on the aerial device rendered it defective. The expert testified that had Hi-Ranger designed a special quick-disconnect coupling device to be used in the aerial bucket, the improper use of a conductive hose could have been avoided.[4] He testified the couplings used by Hi-Ranger were a standard design. According to him, such couplings were not defective from a functional standpoint, but were defective from a safety standpoint. During cross-examination, the engineering expert testified he did not know if the quick-disconnect couplings on the aerial bucket at the time of the accident in 1990 were the same ones that were on the unit when it was manufactured in 1984. He also testified he did not know of any aerial device manufacturer who offered the special-design quick-disconnect couplings he proposed. Furthermore, he conceded the special device he designed was only for demonstration purposes and would not work.

Bragg's next expert, who was qualified in the fields of psychology and human factors, testified about warnings. In his opinion, the aerial bucket was defective because it did not have an adequate warning attached to it advising of the danger of using a conductive hose. There was evidence of a warning decal placed on Hi-Ranger units after Bragg's accident which called attention to the color of hoses. In the witness's opinion, if such a label had been on the aerial bucket at the time of the accident, it would have helped prevent it. However, further testimony in the case revealed the truck used by Bragg had been in two accidents and had been refurbished

---

[4]This expert designed a special quick-disconnect coupling device that would preclude connection of a conductive tool hose line at the bucket. The special device was introduced into evidence by Bragg in support of the expert's contention. The expert conceded, however, that his special quick-disconnect couplings were only for demonstration purposes and would not work because, among other things, they would leak hydraulic fluid.

and repainted.[5] When the aerial device was returned to Ballenger after the repairs, the majority of the safety decals that were previously on the boom of the device had been painted over or removed.[6]

At the conclusion of Bragg's case, the court granted Hi-Ranger's motion for directed verdict on the strict liability cause of action, but denied the motion for a directed verdict on the negligence cause of action. After the ruling, Hi-Ranger presented testimony and evidence in its defense. The court charged the jury on negligence principles with respect to defective design and failure to warn.

## I. *Direction of Verdict of Strict Liability*

In support of her strict liability theory, Bragg's hydraulics expert testified the absence of special quick-disconnect couplings which would preclude the connection of a conductive hydraulic hose to the bucket of the aerial device rendered the aerial device unfit for its intended purpose, defective, and unreasonably dangerous to its user. Bragg's human affairs expert further contended the aerial device was defective and unreasonably dangerous as a result of Hi-Ranger's failure to give adequate warnings as to the risk involved in using the product; specifically, Hi-Ranger failed to affix a decal in the proximity of the bucket which would have warned that a nonconductive hose must be used at the bucket of the aerial device.

Bragg also contended Hi-Ranger was liable under a negligence theory based on the same facts and circumstances as the cause of action in strict liability. Bragg's complaint alleged Hi-Ranger was negligent in failing to place appropriate warnings on the aerial device. The complaint likewise alleged Hi-Ranger was negligent in supplying an aerial device that was

---

[5] Ten months after its sale to Ballenger in early 1985, the bucket truck was involved in an accident. The truck and aerial device were repaired by Baker Equipment Company. Baker repaired the lower boom of the aerial device as well as portions of the truck chassis. In 1987, the bucket truck was again involved in an accident, a rear-end collision with a dump truck. The bucket truck was sent to Altec Industries in Birmingham, Alabama for repair. Altec repaired portions of the chassis of the truck, and performed repairs to the aerial device. It repaired the sheave guard angles and sheave guard of the device which are located directly in front of the bucket of the aerial device. Altec also repaired and replaced two of the quick-disconnect couplings at the bucket of the device.

[6] There is no indication the original decals contained hose color warnings.

defective not from a functional, but from a safety standpoint, and which could have been made safe by a specially designed quick-disconnect coupling device.

In directing a verdict for Hi-Ranger on the strict liability claim, the trial judge concluded: (1) Bragg failed to introduce any evidence that the aerial device was defective or unreasonably dangerous because of a defect in the quick disconnect couplings in 1984 at the time the aerial device was sold; (2) Bragg failed to present evidence of a feasible design alternative for the quick disconnect couplings she claimed were defective due to inadequate design; (3) the aerial device had been substantially changed between the time of its sale in 1984 and the 1990 accident; (4) the warnings on the aerial device at the time of the 1990 accident had been removed, painted over, or replaced and therefore were not substantially in the same condition as they were at the time the unit was sold in 1984; and (5) Bragg failed to establish the aerial device proximately caused her decedent's injuries and death. As relates to the negligence action, the judge concluded, "[t]here is some evidence here which, if believed, could show some degree of negligence on the part of [Hi-Ranger] proximately resulting in injury to Mr. Bragg." He further noted, "[t]he questions of contributory negligence and assumption of the risk are always, of course, jury issues."

On appeal, Bragg contends the court's decision to grant the motion for directed verdict on strict liability, while denying the motion for directed verdict on negligence, was logically inconsistent and reversible error because those claims are virtually identical and require the same proof. We disagree.

A products liability case may be brought under several theories including negligence, strict liability, and warranty. Although substantial similarities in analysis exist between strict liability for the sale of defective products and negligence principles of liability, especially in design and inadequate warnings cases, differences do exist. John E. Montgomery and David G. Owen, *Reflections on the Theory and Administration of Strict Tort Liability for Defective Products*, 27 *S.C.Law Rev.* 803, 828-29 (1976); *see also Griggs v. BIC Corp.*, 981 F. (2d) 1429, 1435 (3rd Cir. 1992) (there is an important theoretical basis for separating and maintaining the

difference between negligence and strict liability law in the products liability context; namely, the underlying analysis necessary to reach each legal conclusion giving rise to liability are qualitatively different in that the social policy determination as to product defect in strict liability is not the equivalent of a determination of duty in negligence law). Strict liability and negligence are not mutually exclusive theories of recovery; that is, an injury may give rise to claims that can be established either under principles of strict liability or negligence, and failure to prove one theory does not preclude proving the other. *Davis v. Globe Machine Mfg. Co.*, 102 Wash. (2d) 68, 684 P. (2d) 692 (1984); *cf. Gasque v. Heublein, Inc.*, 281 S.C. 278, 315 S.E. (2d) 556 (Ct. App. 1984) (Court rejected argument that negligence and strict liability are so closely intertwined it should depart from "two-issue rule" in products liability cases; rather the Court concluded there are "obvious differences between the two theories, i.e., the different quantum of proof required and the fact that one's origins are statutory while the other's are at common law").

As Bragg correctly points out, in order to find liability under any products liability theory, the plaintiff must show: (1) he was injured by the product; (2) the injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) that the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant. *See Madden v. Cox*, 284 S.C. 574, 328 S.E. (2d) 108 (Ct. App. 1985).

However, under a negligence theory, the plaintiff bears the additional burden of demonstrating the defendant (seller or manufacturer) failed to exercise due care in some respect, and, unlike strict liability, the focus is on the conduct of the seller or manufacturer, and liability is determined according to fault. *Id.*, 328 S.E. (2d) at 112; *Sunvillas Homeowners Ass'n v. Square D Co.*, 301 S.C. 330, 391 S.E. (2d) 868 (Ct. App. 1990); *see also Carter v. Massey-Ferguson, Inc.*, 716 F. (2d) 344 (5th Cir. 1983) (the reasonableness of the manufacturer's conduct in view of the foreseeable risk of injury is at issue in a negligence case, but not in a strict liability case where the manufacturer may be held liable even though it exercises the utmost care). Conversely, in a product liability action based on strict liability where a design defect is alleged,

the plaintiff must prove the product, as designed, was in an unreasonably dangerous or defective condition. *Reed v. Tiffin Motor Homes, Inc.*, 697 F. (2d) 1192 (4th Cir. 1982). The focus here is on the condition of the product, without regard to the action of the seller or manufacturer. *Id.* at 1196. In *Bilotta v. Kelley Co.*, 346 N.W. (2d) 616 (Minn. 1984), the Supreme Court of Minnesota further explained the distinction between these two theories as follows:

> The distinction between strict liability and negligence in design-defect and failure-to-warn cases is that in strict liability, knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer, whereas in negligence these elements must be proven.
>
> Whether strict liability or negligence affords a plaintiff the broader theory of recovery will depend largely on the scope of evidence admitted by the trial court and on the jury instructions given under each theory. . . .
>
> . . . [A]ssuming proper instruction to ensure the broadest theory of recovery, a trial court could properly submit a design-defect or failure-to-warn case to a jury on a single theory of products liability. Submission to a single theory of recovery may avoid the confusion and inconsistent verdicts spawned by submission of multiple overlapping theories. . . .

*Id.* at 622.

In *Bigham v. J.C. Penney Co.*, 268 N.W. (2d) 892 (Minn. 1978), an allegedly irreconcilable verdict finding the defendant negligent but not strictly liable was upheld on appeal because the jury instructions given rendered negligence the broader theory of recovery. In that case, an electric company lineman brought suit against a clothing retailer to recover for burns he sustained when an electric arc flash-over occurred as he climbed a ladder to reach a broken insulator. *Id.* at 894-95. The lineman claimed his injuries were aggravated by the "melt and cling" effect of the clothing he wore, a cotton work shirt and pants purchased from the defendant. He alleged that he should have been warned that his work clothes were flammable and if ignited would produce a "melt and cling" effect that would lead to unusually severe burns. *Id.* at 895. The trial

court found that although the plaintiff had assumed the risk of flash-over injuries, he had not assumed the risk of having his burns aggravated by the work clothes he was wearing. *Id.*

On appeal, the Supreme Court of Minnesota held the jury's findings that the work clothes were not "in a defective condition unreasonably dangerous to the plaintiff" and that Penney breached neither an expressed not implied warranty, but was nevertheless causally negligent, were not irreconcilable where there were no warning tags with respect to the flammability of the work clothes. *Id.* at 896. The strict liability instructions required the jury to assess a defect dangerous to the ordinary consumer, whereas the lineman's work subjected him to fire hazards. *Id.* at 897. Therefore, while the failure to warn of the flammable characteristics of the clothing was negligent as to the plaintiff, those characteristics did not necessarily render the clothing "defective and unreasonably dangerous" toward an ordinary consumer not exposed to unusual fire hazards. *Id.* Thus, the Court concluded that "the claimed inconsistencies in the verdict could be resolved to read that the work clothing was not 'defective' because it was hot unreasonably dangerous to the average consumer, but that Penney was negligent in selling it without warnings of its flammability." *Id.* at 898.

Therefore, it is possible under certain circumstances for a supplier of products to be held liable under a negligence theory even though the supplier is not strictly liable. This result is consistent with the principles of strict liability since the manufacturer is not held as an insurer against all losses caused by the product but rather is to be held responsible only for damages attributable to some failure of the product to perform with reasonable safety in its normal environment. *See Claytor v. General Motors Corp.*, 277 S.C. 259, 286 S.E. (2d) 129 (1982); *Reed v. Tiffin Motor Homes, Inc.*, 697 F. (2d) 1192 (4th Cir. 1982).

Consequently, a directed verdict on the strict liability claim in the present case was not, as a matter of law, logically inconsistent with allowing the negligence claim to be submitted to the jury. Having so found, we now turn to the basis of the trial judge's decision to grant a directed verdict on the strict liability claim in favor of Hi-Ranger. After a thorough review of the record, we conclude the trial judge properly dismissed Bragg's strict liability

claim. We concur in the trial judge's finding that Bragg failed to present any evidence that the quick-disconnect couplings on Hi-Ranger's aerial device were defective in 1984 at time it was sold, and failed to introduce evidence of a feasible design alternative for the standard quick-disconnect couplings he claimed made the aerial device defective.

Strict tort liability for defective products was unknown at common law. Its evolution began with *MacPherson v. Buick Motor Co.*, 217 N.Y. 382 111 N.W. 19050 (1916), where common law privity of contract as a predicate requirement for manufacturers' or sellers' tort liability for a defective product was abandoned.[7] Strict products liability in tort was created judicially because of the economic and social need for the protection of consumers in an increasingly complex and mechanized society, and because of the limitations of negligence and warranty remedies. It is premised on the concept that the cost of injuries resulting from defective products should be borne by the manufacturer or seller who puts such products on the market rather than by the ultimate users who are injured by the product and powerless to protect themselves. *Fleming v. Borden, Inc.*, 316 S.C. 452, 450 S.E. (2d) 589 (1994). South Carolina moved in the direction of the modern strict liability approach in *Salliden v. Tellis*, 247 S.C. 267, 146 S.E. (2d) 875 (1966), and *Mickle v. Blackmon*, 252 S.C. 202, 166 S.E. (2d) 173 (1969). In 1974, the General Assembly signaled its agreement by adopting the Restatement (Second) of Torts § 402A as §§ 15-73-10, -20, and -30, S.C. Code Ann. (1976), our Defective Products Act.[8] *See Hatfield v. Atlas Enterprises, Inc.*, 274

---

[7] "Although grounded in the theory of negligence, the *MacPherson* decision was the first step in moving towards strict liability in tort." *Fleming*, 450 S.E. (2d) at 592.

[8] The first section of this Act formulates manufacturers' and sellers' liability as follows:

**§ 15-73-10 Liability of seller for defective product**
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm caused to the ultimate user or consumer, or to his property, if
  (a) The seller is engaged in the business of selling such products, and
  (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

S.C. Code Ann. § 15-73-10 (1976). "This section imposes strict liability upon the manufacturer and seller for an injury to any user caused by its product, if the product is expected to and does reach the user or consumer without substantial change,'" *Fleming*, — S.C. at —, 450 S.E. (2d) at 592.

S.C. 247, 262 S.E. (2d) 900 (1980) (although General Assembly had recognized the clear drift of the common law in this State when it codified Restatement (Second) of Torts § 402A, which imposes strict liability in tort upon the suppliers of defective products, the doctrine of strict liability in tort did not emerge until Code §§ 15-73-10 through -30 (1976) were enacted).

In order to recover under a strict liability theory, the plaintiff must establish that: (1) the defendant's product was in a defective condition unreasonably dangerous for its intended use; (2) the defect existed when the product left the defendant's control; and (3) the defect was the proximate cause of the injury sustained *Livingston v. Noland Corp.*, 293 S.C. 521, 362 S.E. (2d) 16 (1987); *Claytor v. General Motors Corp.*, 277 S.C. 259, 286 S.E. (2d) 129 (1982); *Madden v. Cox*, 284 S.C. 574, 328 S.E. (2d) 108 (Ct. App. 1985). Two tests have evolved to determine whether a product is in a defective condition unreasonably dangerous for its intended use. *Carter v. Massey-Ferguson, Inc.*, 716 F. (2d) 344 (5th Cir. 1983). The first test is whether the product is unreasonably dangerous to the ordinary consumer or user given the conditions and circumstances that foreseeably attend the use of the product. *Id.* at 347; *Claytor*, 277 S.C. at 262, 286 S.E. (2d) at 131. Under the second test, a product is unreasonably dangerous and defective if the danger associated with the use of the product outweighs the utility of the product. *Carter*, 716 F. (2d) at 347. The state of the art and industry standards are relevant to show both the reasonableness of the design and that the product is dangerous beyond the expectations of the ordinary consumer. *Reed*, 697 F. (2d) at 1196.

Further on this point, in determining if a product is defective and unreasonably dangerous, our Supreme Court has held that while any product can be made safer, the fact that it is not does not automatically mean the product is unreasonably dangerous. *Claytor*, 277 S.C. at 264-65, 286 S.E. (2d) at 132. Strict liability is not equivalent either to absolute liability or to insurance of the safety of the product's user. Likewise, the mere fact that a product malfunctions does not demonstrate the manufacturer's negligence nor does it establish that the product was defective. *Sunvillas*, 301 S.C. at 333, 391 S.E. (2d) at 870. Rather, "[i]n the final analysis, we have another of the law's balancing acts and numerous factors

must be considered, including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury, and the obviousness of danger." *Claytor,* 277 S.C. at 265, 286 S.E. (2d) at 132. Thus, in South Carolina we balance the utility of the risk inherent in the design of the product with the magnitude of the risk to determine the reasonableness of the manufacturer's action in designing the product. *Id.* This "balancing act" is also relevant to the determination that the product, as designed, is unreasonably dangerous in its failure to conform to the ordinary user's expectations. *Id.; Reed,* 697 F. (2d) at 1196.

Pursuant to the foregoing standards, we conclude the trial judge correctly directed the verdict in favor of Hi-Ranger on Bragg's strict liability claim. Bragg's hydraulics expert conceded that no one in the industry had designed or manufactured the type of special disconnect couplings he proposed.[9] *See Reed,* 697 F. (2d) at 1197 (in the overall balance of risk and utility of the product, evidence of industry custom is relevant to the ordinary user's expectations). While conformity with industry practice is not conclusive of the product's safety, the cases where a member of industry will be held liable for "failing to do what no one in his position has ever done before" will be infrequent. *See Sexton v. Bell Helmets, Inc.,* 926 F. (2d) 331, 338 (4th Cir. 1991). The expert's testimony was insufficient to prove the aerial device, as designed and manufactured in 1984, was defective and unreasonably dangerous at the time of sale. *Sexton,* 926 F. (2d) at 336 (plaintiff must prove that the product was defective at the time of sale).

The only reasonable inference to be drawn from the whole of the testimony is that the aerial device was not in a defective condition unreasonably dangerous when it left Hi-Ranger's control in 1984. The question of whether the absence of an optional safety device rendered a product defective and unreasonably dangerous was addressed by our Supreme Court in *Marchant v. Mitchell Distributing Co.,* 270 S.C 29,

---

[9] When asked if he had ever known of anythng but a standard coupling being used on an aerial device, the expert responded, "No, nobody, nobody in their right mind, so to speak, would, would vary from the standard . . . for a pipe fitting unless they had one heck of a good reason because of costs."

240 S.E. (2d) 511 (1977).[10] The strict liability action in that case was based on the theory that the absence of a safety attachment called an anti-blocking device rendered a crane unfit for its intended purpose, and in a defective condition unreasonably dangerous. In granting summary judgment for the distributor of the crane, the Court concluded the fact that the crane was without the optional safety device does not tend to prove that it was defective. The Court reasoned:

> Most any product can be made more safe. Automobiles would be more safe with disc brakes and steel-belted radial tires than with ordinary brakes and ordinary tires, but this does not mean that an automobile dealer would be held to have sold a defective product merely because the most safe equipment is not installed. By a like token, a bicycle is more safe if equipped with lights and a bell, but the fact that one is not so equipped does not create the inference that the bicycle is defective and unreasonably dangerous.
>
> . . . .
>
> . . . [T]he fact that the injury occurred and the fact that the crane could have been more safe is not sufficient to support a finding that the crane was unreasonably dangerous. There is, of course, some danger incident to the use of any product. Any product can certainly cause injury if used improperly.

*Id.* 240 S.E. (2d) at 513-14.

Thus, based on the evidence presented at trial, we hold the judge properly ruled that the aerial device was not in defective condition unreasonably dangerous because of a defect in the quick-disconnect couplings in 1984 at the time the aerial device was sold. It was merchantable and fit for the purpose for which it was sold, but caused injury due to its improper use by a third party. The evidence was uncontroverted that a Ballenger field mechanic erroneously installed the conductive

---

[10] Although the special quick-disconect coupling device designed by Bragg's expert can not be considered as an optional safety device because it was not available for sale in 1984 for an additional cost, *Marchant* is sufficiently analogous to the situation at hand to lend support.

hose on the aerial device a few months before the accident in 1990, and six years after the aerial device was manufactured and sold by Hi-Ranger. The fact that there had been no mishaps during this time is additional evidence that the aerial device was not unreasonably dangerous. *See Mickle,* 252 S.C. at 237, 166 S.E. (2d) at 189 (the lapse of time since the sale by the defendant, during which there has been continued safe use of the product, is always relevant, as indicating that the seller was not responsible for the defect). In addition, the Ballenger field mechanic testified he knew he was installing the wrong color hose, he never read the decals on the boom of the truck, and he told Bragg, "I don't think this is the right kind of hose . . . I'm not sure . . . it's not orange." He further testified he did not know the difference between the words conductive and nonconductive, but knew when he put the black hose on the tool line it was not the right color. Accordingly, the failure to incorporate special quick-disconnect couplings into the aerial device did not render it defective and unreasonably dangerous to the intended user considering the aerial devices's characteristics, risks, dangers, and uses, together with the knowledge, training, and experience possessed by the intended user.

Moreover, Bragg failed to introduce evidence of a feasible design alternative. Bragg's hydraulics expert conceded the device he designed and advanced as a nondefective alternative was simply for demonstration purposes and would not work. *See Stanczyk v. Black & Decker, Inc.,* 836 F. Supp. 565 (N.D. Ill. 1993) (plaintiff must introduce evidence that an alternative design is feasible and cannot rely upon mere conceptual design theories).

Because evidence presented at trial undisputedly established that the aerial device met all appropriate standards regarding warnings at the time of its manufacturer and sale in 1984, we further conclude Bragg's strict liability claim based upon an alleged warning defect also fails. Aerial device manufacturers are members of MADDDC, an organization which recommends the type of warnings to be affixed to aerial devices. MADDDC did not recommend installation of a nonconductive hose decal on a aerial device until April 1992. Furthermore, at the time the subject aerial device was manufactured in 1984, no other aerial device manufacturer affixed a

nonconductive hose decal to the bucket. Thus, we conclude the trial judge properly determined that, as a matter of law, Hi-Ranger was entitled to a directed verdict on Bragg's strict liability claim.

## II. *Jury Charges*

Bragg next contends there four jury instructions requested by him which were improperly excluded from the jury charge and two requested by Hi-Ranger which were erroneously given, rendering the total jury charge misleading and in part devoid of applicable law. We disagree.

In reviewing jury charges for error, we must consider the court's jury charge as a whole in light of the evidence and issues presented at trial. If, as a whole, the charges are reasonably free from error, isolated portions which might be misleading do not constitute reversible error. *See Manning v. Dial*, 271 S.C. 79, 245 S.E. (2d) 120 (1978); *Dickard v. Merritt*, 256 S.C. 458, 182 S.E. (2d) 886 (1971); *State v. Barksdale*, 311 S.C. 210, 428 S.E. (2d) 498 (Ct. App. 1993).

Bragg's proposed charges 19, 20, and 23 related to the defenses asserted by Hi-Ranger of assumption of the risk, contributory negligence, and intervening or superseding negligence. The trial court charged the jury on contributory negligence, assumption of the risk, and intervening and superseding negligence. At the request of the jury, the court recharged the law concerning these defenses.

Although the identical language proposed by Bragg was not used in the charge to the jury, the trial court charged the jury on all three concepts. *Varnadore v. Nationwide Mut. Ins. Co.*, 289 S.C. 155, 345 S.E. (2d) 711 (1986) (refusal of a request to charge is not error when the substance of the request is included in the general instructions). After thoroughly reviewing the charges given, we conclude they were an accurate and complete recitation of the law concerning these defenses. We find no error, and affirm these jury charges.

Bragg further contends the trial judge erred in failing to charge its proposed charge number 8 and in charging instead Hi-Ranger's proposed charge 38. Both of these charges relate to a manufacturer's post-sale duty to recall or retrofit its products. Bragg's requested jury instruction number 8 is as follows:

> Under a negligent theory of failure to warn, the duty to warn is continuous and not interrupted by manufacture or sale of the product.

The trial court instead charged Hi-Ranger's proposed charge number is 38:

> The defendant's duty, I impress upon you, ladies and gentlemen, is to exercise reasonable care. A manufacturer of a product is responsible for failing to warn if they know or have a reason to know the product is or is likely to be dangerous for its intended use, they have no reason to believe that the user will realize the potential danger, and they fail to recognize [sic] reasonable care to inform of its dangerous condition or of the facts which make it likely to be dangerous.
>
> A manufacturer, ladies and gentlemen, has no duty to notify previous purchasers of its products about later developed safety devices or to retrofit those products if the products were nondefective under standards existing at the time of the manufacturer or sale. . . .

We conclude the charge given by the trial court is an accurate recitation of law adopted by a majority of jurisdictions concerning a manufacturer's duty to recall or retrofit its products. The case cited by Hi-Ranger to support this jury instruction is *Romero v. International Harvester Co.*, 979 F. (2d) 1444, 1447 (10th Cir. 1992). In *Romero,* a products liability case brought against a manufacturer of a farm tractor which was involved in a rollover accident, the plaintiff contended the defendant should have warned users of the dangers of using the tractor without a roll bar. The plaintiff further contended the tractor should have been retrofitted with a roll bar. The Tenth Circuit Court of Appeals reversed the jury's verdict for the plaintiff on her claim of negligent failure to "see that the tractor was retrofitted with a protective roll guard." In so doing, the court concluded that the majority of jurisdictions have rejected the contention that a manufacturer of a nondefective product must warn prior product purchasers when a new safety device is developed. *Id.* at 1450-51.

The Fourth Circuit has also addressed this issue. In *Sexton,* 926 F. (2d) 331, the court held that a product must be "measured against a standard existing at the time of sale or against

reasonable customer expectations held at the time of the sale." *Id.* at 377. "[H]indsight opinions by experts suggesting that more should have been done . . . are insufficient to discredit the conclusion that the manufacturer met the standard of care." *Doe v. Miles Laboratories,* 927 F. (2d) 187, 193 (4th Cir. 1991).

There was ample evidence presented at the trial of this case that the aerial device met all appropriate standards at the time of its manufacturer in 1984. The trial court's charge relating to the recall and retrofitting of products was appropriate in light of the evidence adduced at trial. First, the witnesses familiar with the manufacturer of aerial devices testified that no manufacturer either in 1984, or at the time of trial, installed a quick-disconnect coupling which would preclude connection of a conductive hose to the bucket of the aerial device. Second, the evidence established that aerial device manufacturers are members of MADDDC which recommends the type of warning to be affixed to aerial devices. MADDDC did not recommend the installation of a nonconductive hose decal on aerial devices until April 1992. The evidence further established that at the time of the manufacture of the subject aerial device, no other aerial device manufacturer affixed a nonconductive hose decal to the bucket of the device.

Finally, Bragg contends the trial court erred in charging Hi-Ranger's proposed charge number 25 which relates to the sophisticated user defense. The trial court charged:

> Now, ladies and gentlemen, under South Carolina law, a manufacturer has no duty to warn of potential risks or dangers inherent in a product if the product is distributed to what we call a learned intermediary or distributed to a sophisticated user who might be in a position to understand and assess the risks involved, and to inform the ultimate user of the risks, and to, thereby, warn the ultimate user of any alleged inherent dangers involved in the product. Simply stated, the sophisticated user defense is permitted in cases involving an employer who was aware of the inherent dangers of a product which the employer purchased for use in his business. Such an employer has a duty to warn his employees of the dangers of the product.

We conclude the trial court properly charges the jury concerning the sophisticated user defense. The sophisticated user defense outlined in section 388 of the Restatement (Second) of Torts has been adopted by numerous jurisdictions. *See Willis v. Raymark Indus., Inc.*, 905 F. (2d) 793 (4th Cir. 1990) (the sophisticated user defense may be permitted in cases involving an employer who is aware of the inherent dangers of a product which the employer purchases for use in its business; if the employer/purchaser has "equal knowledge" of a product's dangers, then the manufacturer may be able to rely on the employer/purchaser to protect its own employees from harm); *see also Goodbar v. Whitehead Bros.*, 591 F. Supp. 552 (W.D. Va. 1984), *aff'd sub nom. Beale v. Hardy*, 769 F. (2d) 213 (4th Cir. 1985) (in failure to warn case brought by employees of foundry suffering from silicosis, the court found that because supplier had reason to believe that the knowledgeable industrial purchaser of the product (the foundry) would recognize the dangers associated with the product, the suppliers' reliance on the foundry to warn and protect the workers was reasonable, and the supplier was not mandated to give warnings directly to the employees).

In *O'Neal v. Celanese Corp.*, 10 F. (3d) 249 (4th Cir. 1993), the Fourth Circuit Court of Appeals, applying Maryland law, upheld the district court's grant of judgment notwithstanding the verdict in favor of an equipment seller based upon the sophisticated user defense.[11] In defining the sophisticated user defense, the court explained, "it is not the specific knowledge of the intermediary that is relevant. Rather, the question is whether the supplier, Celanese, acted reasonably in assuming that the intermediary would recognize the danger and take precautions to protect its employees." The court concluded the supplier was reasonable in relying on the employer to warn its employees since the employer was an experienced operator in the salvage business who knew or should have known that the red-orange paint applied to the plant equipment was an indication of lead paint.[12]

[11] In this case, an employee of a buyer of industrial equipment suffered lead poisoning while using a welding torch to dissasemble plant equipment painted with lead-based paint. As a result, the employee brought a negligence action against the equipment seller.

[12] Although there was testimony that the employee's supervisor was unaware of the significance of the red-orange paint, the court nevertheless

There was significant evidence at trial that Ballenger was a large electrical contractor which frequently used and was familiar with aerial devices. In fact, the evidence established that Ballenger owned a number of bucket trucks. The evidence further established that Ballenger's management was well aware that conductive materials like conductive hoses should not be used in the buckets of aerial devices. Thus, the trial court correctly charged the jury concerning this defense asserted by Hi-Ranger and the trial court's charge was an accurate recitation of the law. The trial court's jury charge, considered as a whole, was proper.

For the foregoing reasons, the judgment in favor of Hi-Ranger is affirmed.

Affirmed.

SHAW and CONNOR, JJ., concur.

stated it is not the knowledge of the intermediary that is important, but whether the supplier was justified in believing the intermediary would recognize the danger.