**Hunter v. General Motors Corporation**

*Richard J. Heleniak*, for appellants
*Mary Grace Maley* and *Mary E. Bolkcom*, for appellees

MAZER MOSS, *J.*, June 13, 2013—

## PROCEDURAL HISTORY

Plaintiffs, John and Barbara Hunter, h/w, appeal this court's orders dated March 3, 2009, March 5, 2009, April 7, 2009 and October 6, 2009. Plaintiff previously appealed this court's findings and order entered on October 6, 2009. denying plaintiff's motion to reconsider the March 3, 2009 order precluding the opinion testimony of R. Scott King and granting summary judgment in favor of defendant, Holman Enterprises d/b/a Saturn at English Creek (incorrectly sued as Holman Enterprises d/b/a Saturn at English Creek and Holman Saturn at English Creek.) Thereafter, the appeal at 3312 EDA 2009 was quashed by order of the Superior Court dated December 23, 2009 as this court's October 6th order was interlocutory.

Following a stipulation approved by the Honorable Sandra Mazer Moss on January 29, 2013 (docketed on February 1, 2013), which severed the claims of defendant,

Holman Enterprises d/b/a Saturn at English Creek from the claims of General Motors Corporation and Saturn Corporation, plaintiff again appealed the October 6, 2009 order as well as this court's orders of March 3, 2009, March 5, 2009 and April 7, 2009.

This court's findings and order of October 6, 2009, denying plaintiff's motion to reconsider the March 3, 2009 order precluding the opinion testimony of R. Scott King and granting, summary judgment in favor of defendant, Holman Enterprises d/b/a Saturn at English Creek will be reproduced in part herein. The court will then discuss the March 5, 2009 and April 7, 2009 orders from which plaintiff also appeals.

## FACTUAL BACKGROUND

This is a products liability action in which plaintiffs allege that their 2003 Saturn VUE was defective in that the rear suspension system caused the vehicle to lose control while plaintiff's were driving in South Carolina returning to their home in New Jersey.

## LEGAL ANALYSIS

This court's findings in support of its orders of March 3, 2009 and October 6, 2009 follow:

Defendants maintain that because of the complexities of the issues that could be presented, a competent expert report is required so that a jury could understand what plaintiff's claim to be a defect in the automobile that Mr. Hunter was driving when it ran off the road and how the

alleged defect was a causal factor in this accident. There is no question that a competent expert report is required here and failing to have same requires the defendant's summary judgment motion be granted, and so it is ordered.

Because of this, the focus now shifts to this court's underlying order which precluded plaintiff's expert from offering his report based upon a finding that it was legally incompetent.

This court will discuss below some but not all of the factors which clearly demonstrated the legal incompetence of the report.

The expert report was a "summary report based upon our review of the materials received." The materials "reviewed" included "a police report, data related to a manufacturer's safety recall/customer satisfaction program, and photographs of the incident vehicle." Expert report of September 16, 2008.

A review of the police report referred to by the expert reveals the following data extracted from this report.

The time was around midnight on or about December 21, 2004 near Waterboro, South Carolina. Plaintiff was driving northbound on Interstate 95. The description of what happened as entered by Cpl Rouse, Badge #831, is as follows.

Unit #1, (Plaintiff's vehicle), (not in original), was travelling North on I-95. The driver of Unit #1 ran off the left side of the roadway and overturned several

times.

South Carolina Traffic Collision Report Form TR310, 12/21/04.

The following data was also extracted from the same report.

*Action prior to Impact*: Movements Essentially Straight Ahead

*Weather Conditions*: Clear

*Light Conditions*: Dark (No Lights)

*Contributing Factors*: Driver: Fatigue/Asleep

Although the expert cited this document as one on which he based his opinion nowhere in his report are the above facts cited, explained or addressed in any way.

Plaintiff's expert report of September 16, 2008, goes on to cite what is referred to as the recall information, which is ostensibly how he arrives at his conclusion of product defect:

The vehicle is prone to rollover during a certain vehicle maneuver that includes a certain series of opposite-direction turns. The recall information indicates that the rollover is preceded by a buckling and failure or a rear suspension control arm that can result in the affected wheel assembly collapsing beneath the vehicle.

Expert Report of September 16, 2008.

A review of the documents he claims supports the conclusion that a manufacturer's recall was operative at the time of the accident for this "rollover prone vehicle"

fails to support plaintiff's expert's conclusions and is contradicted by the documents relied upon. The letter to Saturn VUE owners of August 2004, stated that:

...there have been some recent media reports of rollover tests conducted on the VUE by the National Highway Traffic Safety Administration (NHTSA), the results of which have led the agency to start an investigation. These tests, which were recently adopted, induce a sharp left turn at set speeds between 35 and 50 mph, followed by over correction to the right. Though the VUE did not roll over during the tests, the rear suspension was damaged by wheel contact with the pavements, thus preventing the vehicle from completing the test. It is important to note that the suspension damage was a result of the severity of the test; *at no time did the suspension damage cause loss of control of the vehicle.*

*Of course, your Saturn VUE meets and/or exceeds all Federal Vehicle Safety Standards.* In addition, the 2004 Saturn VUE earned a five-star rating in the frontal and side crash test categories established by NHTSA. However, to maintain confidence and peace of mind with your VUE, Saturn has decided to issue a customer satisfaction recall.

To complete this customer satisfaction recall, Saturn will replace certain rear suspension components and increase the recommended cold inflation tire pressure to reduce the risk of suspension damage. At no charge to you, we will launch this customer satisfaction recall

as soon as possible. We will contact you again once the necessary replacement parts are available[1]

The notice advises of a "customer satisfaction recall" and that, "the VUE did not roll over during the tests."

The December 2004 notice advised in a similar fashion:

In August 2004, Saturn letters to current owners of 2002, 2003 and 2004 model year Saturn VUE vehicles to announce a voluntary customer satisfaction program, 04067. In our correspondence we explained that our parts inventory was not sufficient to perform all replacements at that time. We stated we would contact you again once replacement parts became available.

The rear suspension lateral link assemblies of certain model year 2002-2004 Saturn VUE vehicles may deform if subjected to a handling maneuver similar to that performed in the National Highway Traffic Safety Administration's (NHTSA's) newly implemented Dynamic Maneuvering Test ("Fishhook" Test). Deformation of the lateral link could result in the tire and wheel tipping inward until the tire contracts the trailing arm. If the tire were to contract the trialing arm, tire rotation would be inhibited.

---

1. The expert report fails to distinguish between the two types of recalls at issue here. The distinctive operative nature of the recalls is significant. 'A customer satisfaction recall is significantly different from a safety recall. A safety recall involves a condition that presents an unreasonable risk of crashes or risk of injury or death in the event of a crash. A customer satisfaction recall is performed to protect the reputation of General Motors products or to provide owners with a product improvement after delivery of the vehicle.' (Report of Dennis Kunkel, August 28, 2008 at p.5.

The document that plaintiff's expert appears to be relying upon is identified as a Field Performance Evaluation Report: Subject: Rear Suspension Toe Link Fishhook Test Deformation 2002-04 Saturn VUE.

This report identified the testing procedure performed on the test vehicles.

Investigation/analysis Results:

NHTSA identified the condition in June 2004 on two 2004 Saturn vehicles (one front wheel drive and one all wheel drive) while conducting the Dynamic Maneuvering Test at 45 mph.

NHTSA instituted the Dynamic Maneuvering Test in the 2004 model year to assess the dynamic performance of vehicles with respect to stability and rollover propensity. The test supplements the existing static stability factor and generates a star rating for the vehicle. The NHTSA static stability factor is an engineering calculation based on the track width (the distance between two wheels on the same axle) and the height of the center of gravity above the road. The dynamic Maneuvering Test consists of a sharp left turn (-270 degrees) at a series of speeds between 35 and 50 mph, followed by an over correction of 540 degrees to the right. NHTSA testing of the two VUE vehicles resulted in deformation of the toe link due to high loading induced by tire debeading and subsequent rim to ground contact. Both vehicles behaved in the same manner.

GM investigation identified that rear toe link loads generated by the Dynamic Maneuvering Test exceeded validation loads. As measured at the GM Milford Proving Grounds, rear toe link loads typically peak at 6 kN, but loads in the Dynamic Maneuvering Test peak at approximately 25 kN due to lateral forces.

This same report also identified four field cases which involved single vehicle rollovers.

NHTSA has identified four field cases where VUE vehicles were involved in single vehicle rollovers and the rear suspension was deformed. However, the deformation of the toe links in these vehicles was not the same as in the NHTSA-tested vehicles. The NHTSA-tested vehicles collapsed at the knuckle, while the field cases bent at the center, indicating different loading characteristics.

The expert report failed to identify the deformity in the subject vehicle and failed to identify which information or data was relied upon in arriving at his conclusion. Further, the expert failed to identify how the movement of the plaintiff's vehicle correlated in any way with the movement of the test vehicle (which was the cause of the deformation of the test vehicle). For example, the "fishhook" maneuver consisted of a 270° turn to the right causing the lateral link assembly of the rear wheel to deform, causing the wheel to tip in and contact the trailing arm and stop it (the wheel) from rotating.

The plaintiff subsequently described the movement of

the car differently from the police report in a communication with his insurance carrier.

> John Hunter driving, traveling North on I-95-54 miles into South Carolina car went off Highway towards road divider. Adjusted car from 25° angle back towards highway, car rear began to swing to left. Car now on 45° angle back to Highway-adjusted left to get rear wheels behind *car violently whipped rear to Highway where we began to tumble on grass (3-4) times). Last tumble landed upright.

In the section under, "Who was at fault?-Why?" plaintiff answered as follows:

> Don't know-possible black ice, possible Saturn Rear-Wheel Collapsing.

> Saturn recall of rear wheels collapsing finally received in December-since August, just before we left for trip, Saturn wheels collapsed during testing.

Driver's statement of auto accident, 1/10/05.

Nowhere in the plaintiff's expert report is there an attempt to synthesize the above apparently contradictory information and explain which information he relied upon and why. Nowhere in the plaintiff's expert report is there any guidance as to what facts were relied upon and why.

Plaintiff driver says without further explanation, the car, "went off the highway towards road divider." This precipitates any turning movement which is the apparent maneuver which is the first link in the dynamic chain

allegedly leading to a causal deformity. The expert report stands mute in reconciling this critical issue with what he claims to be the causal defect.

In paragraph 4 of the plaintiff's expert report he says:

The post-incident photographs of the incident vehicle generally depict damages consistent with the incident described in the police report. Those photographs also show damage to the left rear suspension system, including buckling and failure of the left rear control arm. In particular, the photographs depict rear suspension system failure consistent with the kind of failure described in the recall data that can precede a vehicle rollover. Thus, the photographs are consistent with indicating that the incident vehicle overturned because the suspension system failed in the manner described in the recall data.

There are over 200 photographs depicting the post accident damage which necessarily includes the significant damage incurred from the three complete rollovers as described by the plaintiff driver.

The expert did not perform a physical inspection of the subject vehicle and in his report and subsequent conclusion relies exclusively on these photographs but nowhere in his report identifies which of the hundreds of photographs he relied upon for his conclusion. Nowhere in his report does he identify that damage to the wheels and under-carriage which was caused by the forces generated by the impact of three consecutive and forceful contracts with the

ground during the three complete revolutions experienced within the rollover cycle. Nowhere in his report does he specifically identify the claimed causal defect either descriptively or point to it within the hundreds of photographs available for review. The most specific defect that his report can muster is to say that the rear suspension failure *is consistent with the kind of failure described in the recall data.* (Emphasis supplied)

The expert again refers back to the police report referred to above.

A review of this same police report shows that the factors identified in the report as causing the accident are:

The driver of Unit #1 ran off the left side of the roadway and overturned several times....*Contributing Factors*: Driver-Fatigue/asleep.

Lastly, the proffered expert report acknowledged that the author was incapable of rendering causation because he had not inspected such vehicle and therefore was incapable of rendering a causation opinion based upon the alleged defect.

"Such an inspection will be required by this office in order to determine if the vehicle overturned because of the recall failure. (Expert report 9/16/08).

It is well settled that expert testimony is incompetent if it lacks an adequate basis in fact. The expert is allowed only to assume the truth of testimony already in evidence. *Hussey v. May Dep't Stores, Inc.*, 238 Pa. Super. 431, 357

A.2d 635, 637 (Pa. Super. 1976).

An expert cannot base his opinion upon facts which are not warranted by the record. No matter how skilled or experienced the witness may be, he will not be permitted to guess or to state a judgment based on mere conjecture. *Collins v. Hand*, 431 Pa. 378; 246 A. 2d 398, 404 (1963). In *Collins*, Our Supreme Court adopted the standard for measuring the competency of an expert's opinion set forth in *Dreher v. Order of United Commercial Travelers of America*, 173 Wis. 173, 180 N.W. 815, 817 (1921), which stressed that expert opinions must be based on sound facts:

> It is the function of opinion evidence to assist the jury in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion. The opinion must be an intelligent and reasonable conclusion, based on a given state of facts, and be such as reason and experience have shown to be a probable resulting consequence of the facts proved. The basis of the conclusion cannot be deduced or inferred from the conclusion itself. *In other words, the opinion of the expert does not constitute proof of the existence of the facts necessary to support the opinion.* (Emphasis in original). *Id.*

An expert also cannot base an opinion on facts which are not warranted by the record. *Kelly v. St. Mary Hosp.*, 2001 PA Super 175, 778 A.2d 1224, 1227 (2001) (citing *Collins*, 246 A.2d at 404).

In the more recent decision of *Downey v. Crozer-Chester*, 817 A.2d 517, 528, 2003 Pa Super 51 (2003), our Superior Court stated that "[a]n expert's opinion must be supported by references to facts, testimony or empirical data and must delineate how the opinion, based on the record, gives rise to a genuine issue of material fact" in order to overcome a summary judgment motion. *(See also Kenner v. Kappa Alpha Psi Fraternity, Inc.*, 2002 PA Super 197, 808 A.2d 178 (Pa. Super. 2002) (affirming entry of summary judgment where an expert's opinion contained within a report, failed to point to specific facts, testimony or empirical data for support) (citing *Checchio v. Frankford Hospital*, 717 A.2d 1058, 1062 (1998)) (affirmed summary judgment when expert opinion was based entirely on subjective assessments)).

Here, this expert did no more than arrive at a conclusion favorable to the plaintiff and in doing so ignored the information he says his conclusion was based upon or misstated the facts that were included in these same documents and produced a conclusion that can, 3 at best, be described as uninformed speculation.

For the above reasons and the record as a whole defendant's motion for summary judgment was granted in favor of defendant Holman only.

This court will now address plaintiffs' remaining errors alleged on appeal. First, plaintiffs contend that this court erred by granting defendant General Motors Corporation's motion in limine to apply South Carolina Law.

In deciding choice of law questions, we first must determine whether a true conflict exists between the laws of the two states, and, if a true conflict is present, we must analyze the governmental interests underlying the issue and determine which state has the greater interest in the application of its law.

*Rosen v. Tesoro Petroleum Corp.*, 399 Pa. Super. 226, 231, 582 A.2d 27, 30 (1990) *citing Cipolla v. Shaposka*, 439 Pa. 563, 267 A. 2d 854 (1970).

As defendant General Motors Corporation explains in its motion in limine, Pennsylvania products liability law differs significantly from South Carolina products liability law. South Carolina law provides,

A products liability case may be brought under several theories, including strict liability, warranty, and negligence. *See Bragg v. Hi-Ranger, Inc.*, 319 S.C. 531, 462 S.E.2d 321 (Ct. App. 1995). In a products liability action, regardless of the theory on which the plaintiff seeks recovery, he must establish three elements: (1) he was injured by the products: (2) that injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) that the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant.

*Small v. Pioneer Mach. Inc.*, 329 S.C. 448, 462-63, 494 S.E.2d 835, 842 (Ct. App. 1997).

In contrast, in Pennsylvania,

In products liability cases, §402A of the Restatement (Second) of Torts has been adopted as the law of this Commonwealth, *Webb. v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), and to prevail, the plaintiff must prove (1) that the product was defective, (2) that the defect existed when it left the hands of the defendant, and (3) that the defect caused the harm. *Ellis v. Chicago Bridge & Iron Co.* 376 Pa. Super. 220, 235, 545 A.2d 906, 909 (1988).

*Riley v. Warren Mfg., Inc.*, 455 Pa. Super. 384, 390, 688 A.2d 221, 224 (1997).

Thus, South Carolina law requires plaintiffs to establish that the product was not only defective but also unreasonably dangerous to the user. Evidence of industry standards is admissible to demonstrate the reasonableness of the design and that the product is dangerous beyond the expectations of the ordinary consumer; however, evidence of industry standards is not admissible in Pennsylvania products liability cases. *See Bragg v. High-Ranger, Inc.*, 319 S.C. 531, 543, 462 S.E.2d 321 (Ct. App. 1995); *Harsh v. Petroll*, 840 A. 2d 404, 425 (Pa. Commw. Ct. 2003).

After having determined that a conflict exists between the laws of Pennsylvania and South Carolina, this court determined that South Carolina law should apply because South Carolina has the most significant relationship to the events precipitating the filing of the instant matter.

Under principles of comity, the rights and liabilities of the parties with respect to a tort action are determined

by the law of the state which has the most significant relationship to the occurrence and the parties. *See Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964); Restatement (Second) of Conflicts of Laws, §§145, 146; *see also Giovanetti v. Johns-Manville Corp.*, 372 Pa. Super. 431, 539 A. 2d 871 (1988): *Miller v. Gay*, 323 Pa. Super. 466, 470 A.2d 1353 (1983). The following contracts, which are to be applied qualitatively rather than quantitatively under the case law, that are taken into account in determining which state law applies: the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation, and place of business of the parties; and the place where the relationship between the parties is centered. Furthermore, in an action for personal injuries, the law of the state where the injury occurred normally determines the rights and liabilities of the parties, unless another state, applying the contacts test, has a more significant relationship to the occurrence and parties.

*Laconis v. Burlington Cnty. Bridge Comm'n*, 400 Pa. Super. 483, 491-92, 583 A.2d 1218, 1222-23 (1990).

Other than the fact that General Motors Corporation and Saturn Corporation both sell motor vehicles within the Commonwealth, Pennsylvania has no relationship to the instant action. Plaintiffs are residents of New Jersey and purchased the vehicle involved in the accident in New Jersey from Holman Saturn of English Creek. Defendant

General Motors Corporation is a Delaware corporation with its principal place of business in Michigan. Defendant Saturn Corporation is a Delaware Corporation with its principal place of business in Michigan.

The motor vehicle accident occurred in South Carolina; therefore, South Carolina has the most significant relationship to the occurrence, and South Carolina products liability law should be applied.

Second, plaintiffs contend that this court erred by granting defendants' motion to preclude plaintiffs from misrepresenting the contents of documents.

Specifically, defendants sought to preclude plaintiffs from claiming: In August 2004, John Hunter received a letter from Saturn Corporation indicating that a rollover test conducted on the Saturn Vue vehicle had revealed an increased rollover risk when the vehicle was subjected to certain steering maneuvers. (Defendants' motion in limine, ¶2, quoting plaintiff's pretrial memorandum).[2]

This court granted the motion without prejudice to plaintiffs presenting the actual documents received by the plaintiffs at trial. Pursuant to Pennsylvania Rule of Evidence 1002, an original writing is required to prove its content. Under Rule 1003, a duplicate is also admissible to the same extent as the original "unless a genuine question is raised about the original's authenticity or the

---

2. Defendants also sought to prevent plaintiffs' expert, R. Scott King from claiming that he reviewed recall information for the Saturn VUE; however, because this court has precluded R. Scott King's testimony, the issue is moot.

circumstances make it unfair to admit the duplicate." Pa. R.E. 1003. As explained by the comments to Rule 1002, "The rule inhibits fraud because it allows the parties to examine the original documents to detect alterations and erroneous testimony about the contents of the document." Pa. R.E. 1002. Thus, plaintiffs are permitted to introduce the August 2004 letter into evidence at trial, but neither they nor their experts should be permitted to testify as to their interpretation of the letter as plaintiffs suggest in their answer in opposition to the motion in limine.

Third, plaintiffs contend that this court erred by denying plaintiffs' motion to preclude reference to, use of, or introduction of statements of Alan Rouse, Carole Craddock and Arthur Cook, Jr. Alan Rouse is a South Carolina police officer, and Carole Craddock and Arthur Cook, Jr. are emergency medical personnel. All three have supplied sworn statements confirming their written reports made at the crash scene.

These witnesses are residents of South Carolina and thus not subject to the subpoena power of this court as trial witnesses; therefore, defendants' counsel sought their depositions. According to the affidavit submitted by Mary Bolkcom, Esquire, she first contacted plaintiffs' counsel about scheduling the depositions on December 5, 2007. (Affidavit of Mary Bolkcom, attached to response to plaintiffs' motion in limine, ¶4). A Commission for Issuance of Subpoenas by the Colleton County South Carolina Court was issued by this court on July 8, 2008. (Affidavit of Mary Bolkcom, attached to response to

plaintiffs' motion in limine, ¶4). Ms. Bolkcom noticed the depositions for November 19, 2008, and due to a scheduling conflict, the depositions were again noticed for November 20, 2008. (Affidavit of Mary Bolkcom, attached to response to plaintiffs' motion in limine, ¶5).

Plaintiffs' counsel, Gregory Heleniak responded by letter that he was unavailable in person on November 20th and declined to participate by telephone. (Affidavit of Mary Bolkcom, attached to response to plaintiffs' motion in limine, ¶6). Other dates were suggested; however, Trooper Alan Rouse was unavailable. (Affidavit of Mary Bolkcom, attached to response to plaintiffs' motion in limine, ¶6). On November 19, 2008, plaintiffs' counsel filed an emergency motion to preclude the depositions. (Affidavit of Mary Bolkcom, attached to response to plaintiffs' motion in limine, ¶7). After being informed that Ms. Bolkcom did not intend to take discovery depositions, but only to secure the witnesses' statements, Mr. Heleniak stated he could not prevent defendants' counsel from taking the statements, and the withdrew the emergency motion. (Affidavit of Mary Bolkcom, attached to response to plaintiffs' motion in limine, ¶7). Ms. Bolkcom took statements from each of the three witnesses under oath on November 20, 2008. (Affidavit of Mary Bolkcom, attached to response to plaintiffs' motion in limine, ¶8).

Plaintiffs did not object to defense counsel taking the statements, which is evidenced by their decision to withdraw the emergency motion. The motion in limine objects to what plaintiffs characterize as leading questions;

however, plaintiffs do not specify which statements they are referring to, and this court cannot identify any leading statements.

Furthermore, even if the substance of the statements could be excluded at trial, the statements would be admissible as the bases of defendants' experts' opinions pursuant to Pennsylvania Rule of Evidence 703.[3] The statements merely confirm the information in the reports made at the scene of the accident, and experts may rely on the statements of first responders in formulating their opinions

Fourth, plaintiffs contend that this court erred by granting defendants' motion to quash notices to attend directed to defendants' corporate representatives. However, the court granted the motion as uncontested. As plaintiffs never objected to the motion, they have not preserved the issue for appeal, and this court will not address it.

## CONCLUSION

For the foregoing reasons, this court respectfully requests that its orders entered March 3, 2009, March 5, 2009, April 7, 2009 and October 6, 2009 be affirmed.

## OPINION

Plaintiffs, John and Barbara Hunter, h/w, filed a complaint on December 8, 2006. Complaint, 03/24/11.

---

3. An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. Pa. R.E. 703.

This matter was assigned to this court on November 7, 2012 as the Team Leader for the 2009 and Back Program. We approved a stipulation on January 29, 2013 severing the claims of defendant, Holman Enterprises d/b/a Saturn at English Creek from the claims of General Motors Corporation and Saturn Corporation. Order, 1/29/13. Plaintiffs now appeal the orders of October 6, 2009, March 3, 2009, March 5, 2009, and April 7, 2009. Each of the appealed orders was decided by the Honorable Allan L. Tereshko.

This court relies upon the reasoning set forth in Judge Tereshko's opinion, which is attached and incorporated herein. Opinion, 06/04/13. Accordingly, this court's orders dated October 6, 2009, March 3, 2009, March 5, 2009, and April 7, 2009 should be affirmed.