**Jonathan DISHER, Plaintiff,**

v.

**SYNTHES (U.S.A.), Defendant.**

No. C/A 2:03–4174–18.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 27, 2005.

fraud, and violation of the South Carolina Unfair Trade Practices Act, and proceeds solely on the strict liability claim based upon an alleged design defect.

After considering both parties' briefs and arguments, the court grants defendant's Motion for Summary Judgment on the grounds that there is no genuine issue of material fact for trial. As more fully set forth below, plaintiff has failed to present sufficient evidence of a product defect and has failed to establish that the product, a Titanium Humeral Nail, proximately caused plaintiff's alleged injuries.

## I. Background

This is a products liability action arising out of the fracture of a Titanium Humeral Nail ("Nail") implanted in the arm of plaintiff after plaintiff was involved in an automobile accident on March 27, 1999. (Pl.'s Dep. at 80–83.) In the accident plaintiff broke multiple bones in his left ankle, fractured his right fibula (lower leg) and his left humerus (upper arm) and chipped several teeth. (Pl.'s Dep. at 85; MUSC Discharge Summary, Def.'s Mot. for S.J. Ex. B.) Dr. Richard Friedman at the Medical University of South Carolina ("MUSC") operated on plaintiff on the same day to repair plaintiff's left ankle fracture and his right fibular fracture and also to perform a non-surgical manipulation of his left humeral fracture. On March 30, 1999 Dr. Langdon A. Hartsock at MUSC performed a second surgery on plaintiff, implanting a 7.5 mm × 280 mm Titanium Humeral Nail manufactured and sold by Synthes on plaintiff's left humerus. The purpose of the Nail was to function as a temporary

Akim Angelo Anastopoulo, Constance A. Anastopoulo, Eric S. Brock, Samuel Kimeron Allen, Anastopoulo Law Firm, Charleston, SC, for Plaintiff.

Susan Pedrick McWilliams, Nexsen Pruet Jacobs and Pollard, James Walker Coleman, IV, J. W. Nelson Chandler, Parker Poe Adams and Bernstein, Charleston, SC, for Defendant.

## ORDER

NORTON, District Judge.

This matter comes before the court on defendant Synthes' (U.S.A.) ("Synthes") Motion for Summary Judgment, filed on November 9, 2004, to which plaintiff Jonathan Disher ("Disher") has filed brief in opposition.[1] Plaintiff has voluntarily withdrawn his causes of action for breach of express warranties, breach of implied warranties, Restatement of Torts § 402B,

---

1. On December 20, 2004 defendant filed a Motion to Strike Plaintiff's Response to Defendant's Motion for Summary Judgment on the grounds that the Response was untimely. Because the court grants defendant's Motion for Summary Judgment, the defendant's Motion to Strike is moot. Nevertheless, the Motion to Strike is effectively denied insofar as the court has already reviewed and considered plaintiff's Response and entertained oral argument from plaintiff's counsel.

internal splint to align the fracture and enable healing. (Townsend Dep. at 49–50; Ladd Dep. at 22, 24; Hartsock Aff. ¶ 8; Dalton Aff. ¶ 7.)

Every expert and treating physician in this case has testified that the Nail is a temporary fixation device. (Townsend Dep. at 49–50; Ladd Dep. at 24; Hartsock Aff. ¶ 8; Dalton Aff. ¶ 7.) Dr. Amy Ladd, the surgeon who removed the Nail, testified to the medical phenomenon called "the implant race," which describes the process that occurs when a metallic device is implanted for skeletal fractures. (Ladd Dep. at 15.) Essentially, a race begins during which either the bone will heal (which relieves stress initially borne by the implant) or the implant will break if the bone does not heal. *Id.*

In June of 2000, plaintiff moved from South Carolina to California. (Pl.'s Dep. at 107.) On February 5, 2001 plaintiff went to a Stanford University Hospital clinic in Palo Alto, California complaining of arm pain and a perceived deformity in the shape of his arm. (Stanford University Hospital Initial Patient Visit Report of February 5, 2001, Def.'s Mot. for S.J. Ex. I.) On March 8, 2001 an x-ray of the left upper extremity demonstrated that the Nail had fractured and plaintiff was diagnosed with a nonunion. (Stanford University Hospital Patient Visit Report of March 8, 2001, Def.'s Mot. for S.J. Ex. I.) Surgery was indicated to repair the nonunion. (Ladd Dep. at 13; Stanford University Hospital Operation Report, Def.'s Mot. for S.J. Ex. I.) The primary purpose of the surgery was to repair the nonunion. (Stanford University Hospital Operation Report, Def.'s Mot. for S.J. Ex. I.) On July 6, 2001 the fractured Nail was removed and the nonunion was repaired by Dr. Ladd utilizing a Synthes DCP plate. (Stanford Hospital Discharge Summary of July 10, 2001, Def.'s Mot. for S.J. Ex. I.)

Dr. Ladd testified there was nothing wrong with the Nail, and that it failed, in her opinion to a reasonable degree of medical certainty, most probably because of plaintiff's nonunion and morbid obesity, which placed "extraordinary demands on the humerus."[2] (Ladd Dep. at 17, 21, 22.). The opinions of Synthes' medical expert (Dr. Dalton) and of the surgeon who implanted the nail (Dr. Hartsock) regarding the temporary purpose of the Nail, what will likely occur to an implant in the event of a nonunion and resulting excessive load on the implant, and why the Nail likely fractured, are in accord with Dr. Ladd. (Hartsock Aff. ¶¶ 8–12; Dalton Aff. ¶¶ 9–14.) Dr. Dalton and Dr. Hartsock further opined that the surgery performed by Dr. Ladd would have been necessary to repair plaintiff's nonunion regardless of whether or not the Nail had fractured. (Hartsock Aff. ¶ 14; Dalton Aff. ¶ 14.) Plaintiff offered no expert medical opinion on these issues.

## II. Summary Judgment Standard

Summary judgment should be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by "pointing out to the court that there is an absence of evidence to support the nonmoving party's case." *Cel-*

---

**2.** At the time of the July 2001 surgery to remove the implant, plaintiff weighed over 360 pounds and was listed as "morbidly obese." (Stanford University Hospital Initial Patient Visit Report of February 5, 2001, Def.'s Mot. for S.J. Ex. I.)

*otex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Evidence should be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, a "mere scintilla" of evidence will not preclude summary judgment. The court's inquiry is "not whether there is literally no evidence, but whether there is any [evidence] upon which a jury could properly ... find a verdict for the party" resisting summary judgment. *Id.* at 251, 106 S.Ct. 2505. Conclusory allegations or denials, without more, will not preclude the granting of a summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985).

### III. Discussion

■ Under South Carolina law, "in order to find liability under any products liability theory, a plaintiff must show: (1) he was injured by the product; (2) the injury occurred because the product was in a defective condition, unreasonably dangerous to the user; and (3) that the product at the time of the accident was in essentially the same condition as when it left the hands of the defendant." *Bragg v. Hi–Ranger, Inc.*, 319 S.C. 531, 539, 462 S.E.2d 321, 326 (1995). Plaintiff has failed to proffer the expert testimony that is required to establish that the nail was defective and unreasonably dangerous, and that the nail was the proximate cause of his alleged injuries.

#### a. Defective and Unreasonably Dangerous

■ "Products liability actions require proof that the 'injury occurred because the product was in a defective condition, unreasonably dangerous to the consumer.'" *Jones v. Danek Med., Inc.*,

No. 96–3323–12, 1999 WL 1133272, at *6 (D.S.C.1999) (*quoting Bragg*, 319 S.C. at 539, 462 S.E.2d at 326). To establish defect and unreasonable danger in a medically complex case, plaintiff must come forward with relevant and reliable expert testimony on these issues. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Minisan v. Danek Med., Inc.*, 79 F.Supp.2d 970, 977 (N.D.Ind.1999) (reiterating that an alleged defect in a medical implant "must be proven by expert testimony").

Plaintiff relies upon the testimony of his only proffered expert witness, Douglas Townsend, Ph.D. According to his testimony, Dr. Townsend considers himself an expert in only metallurgy, failure analysis, and, possibly, corrosion. (Townsend Dep. at 14.) Dr. Townsend's proffered testimony, however, does not satisfy plaintiff's burden of demonstrating product defect and unreasonable danger. First, Dr. Townsend concedes that he does not possess the requisite expertise in the area of biomechanical design, which is the ultimate issue with respect to the fracture of the Nail. (Townsend Dep. at 15.) Second, as a matter of law, Dr. Townsend's metallurgical opinions fall short of proving that the Nail was defective and unreasonably dangerous. In fact, Dr. Townsend conceded as much in his deposition and declined to label the nail as "defective." (Townsend Dep. at 93.) Therefore, plaintiff has not demonstrated a genuine issue of material fact as to whether the Nail was defective and unreasonably dangerous.

■ Although Dr. Townsend submitted that he is "reasonably skilled" in commenting upon the structural design of certain portions of a surgical implant (Townsend Dep. at 16), he stopped short of rendering an opinion as to how any conceptually different nail would function in the human

body (Townsend Dep. at 67—68.) He reiterated the boundaries of his expertise throughout the course of his deposition:

Q: And based on your experience and knowledge in working with these devices, what factors are important· in the design and the make-up of the devices in order to ensure that you maintain the purpose of treating patients?

A: I think we're getting beyond my knowledge. I am not a physician. I'm not an orthopedic surgeon.

(Townsend Dep. at 83.)

Q: And do you have any knowledge sitting here today of any specific safer designs?

A: Well, you sent me a package of literature, but again, I don't have the knowledge of designing humeral nails that I would need to make that opinion. However, since there are a wide variety of designs, there are obviously people who do have opinions in that regard. I'm not one of them.

(Townsend Dep. at 88—89.)

Q: And again, if you had the screw holes placed further away from the distal end ... do you have an opinion or any knowledge as to whether or not that would enable a surgeon to stabilize the bone fragments?

A: No opinion.

(Townsend Dep. at 99—100.) Therefore, plaintiff has not come forward with any proposed expert to offer biomechanical testimony. Plaintiff has no means of establishing how any proposed, theoretical modifications to the design of the Nail would function once implanted in the human body. Without testimony necessary to fill this evidentiary gap, plaintiff cannot, as a matter of law, establish that the Nail was defective or unreasonably dangerous. *See, e.g., Padgett v. Synthes, Ltd.,* 872 F.2d 418, 1989 WL 27493, at *1 (4th Cir.1989)

(affirming directed verdict in medical implant case where plaintiff. relied on testimony of a "mechanical and metallurgical engineer who had no expertise in biomedical engineering" and could not offer expert testimony on the requisite biomechanical issues).

■■■ Moreover, Dr. Townsend's opinions do not even meet the threshold requirements for establishing that the Nail was defective and unreasonably dangerous in its design. Speculative or conclusory allegations of defective design do not, as a matter of law, establish the existence of a defect. See *Talley v. Danek Medical, Inc.,* 179 F.3d 154, 162 (4th Cir.1999) (affirming lower court's rejection of expert's speculative and subjective opinions on the design of the subject implant device as insufficient to withstand summary judgment). Plaintiff offers only the speculative and conclusory opinions of Dr. Townsend that the Nail could have been made stronger by using a different alloy, by moving and/or eliminating certain screw holes, and by making the screw holes smaller. (Townsend Dep. at 113.)

■■ In stating that the Nail "could have been made stronger," but declining to testify that the Nail was defective, Dr. Townsend was consistent with the law on point. The law recognizes that every product on the market could be "made stronger" or "more safe," but the mere fact that the product could be "stronger" or "safer" does not establish a design defect or an unreasonably dangerous condition, as a matter of law. *See, e.g., Jones,* 1999 WL 1133272, at *6 (noting that "the fact that something may have been made more safe does not indicate the presence of a defect"); *Claytor v. General Motors Corp.,* 277 S.C. 259, 265, 286 S.E.2d 129, 132 (1982) (noting that a risk-utility analysis must be performed to weigh the usefulness and desirability of a product as it exists

against any attempt to make it "more safe"). As such, Dr. Townsend's assertions regarding the potential use of a different alloy and the placement and size of the screw holes are similarly insufficient to demonstrate a product defect. *See Talley v. Danek Med., Inc.*, 7 F.Supp.2d 725, 732 (E.D.Va.1998); *see also Menges v. Depuy Motech, Inc.*, 61 F.Supp.2d 817, 827 (N.D.Ind.1999) (rejecting similarly "conclusory testimony" as "insufficient to prove a product defect" in the context of a medical implant case).

Moreover, Dr. Townsend offers no research to substantiate his criticisms of the Nail, nor have his theories been tested or subjected to peer review:

Q: And in forming your opinions in this case, have you researched the history of fractures with this particular design?

A: No.

Q: Have you researched the history of fractures with other designs of the same type of nail?

A: No.

(Townsend Dep. at 90.)

Q: Have any of the opinions that you have stated today regarding the fact that the nail could have been made stronger by using a different alloy[,] by placing the screw holes in a different place[,] have any of those opinions been tested or subject to peer review?

A: I have no idea.

(Townsend Dep. at 112.)

Dr. Townsend's speculative and conclusory assertions regarding the titanium alloy and screw holes fail to establish a design defect as a matter of law. *See, e.g., Padgett*, 872 F.2d 418, 1989 WL 27493, at *1 (rejecting expert's conclusory assertions that implant could have been made of a stronger metal where expert was, like Dr. Townsend, a metallurgist with no experience designing medical implants).

■■■ Further, to survive summary judgment, it is "crucial" that a plaintiff also demonstrate that a "feasible," or workable, design alternative exists under the circumstances. *See Little v. Brown & Williamson Tobacco Corp.*, 243 F.Supp.2d 480, 495–96 (D.S.C.2001) (noting that failure to provide such evidence is "fatal to a product liability case" under South Carolina law). Plaintiff has failed to present any evidence of any feasible design alternative for the Nail. Plaintiff's counsel conceded as much at the hearing. Instead, Dr. Townsend offers only untested hypothetical suppositions to attempt to establish this required element of plaintiff's case. "Conceptual design theories," however, will not suffice. *Bragg*, 319 S.C. at 542–46, 462 S.E.2d at 327–30. Dr. Townsend has never tested or been involved in the manufacture of the Nail or any similar product. (Townsend Dep. at 103, 106.) Moreover, Dr. Townsend admits that he has no knowledge as to whether anyone else has designed or manufactured a humeral nail in the manner that he envisions:

A: I don't know if these other designs are on the market. I don't know if they have been found to be safer. I'm not party to the information that would be necessary to determine that.

(Townsend Dep. at 89.)

Q: Are you aware of any alternative safer design on the market right now with respect to humeral nails?

A: I haven't made that determination.

(Townsend Dep. at 97.)

■■■ Not only has plaintiff failed to proffer any alternative design or to identify anyone else who has produced such a design, he has proffered no evidence that any such alternative design would be feasible or practical. In determining whether an alternative design is practical or feasible, courts will look to see whether a risk-

utility analysis has been conducted to weigh the benefits of any new design against the costs and potentially adverse consequences of the design. *See Claytor,* 277 S.C. at 265, 286 S.E.2d at 132 (identifying the factors to consider as part of a cost-benefit analysis, including the usefulness and desirability of the particular product). Dr. Townsend admittedly is not qualified to conduct such an analysis and has not even attempted to do so:

Q: Would—why do you think the screw holes and the nail are placed where they are?

A: I don't have an opinion as to why they are placed where they are.

(Townsend Dep. at 97.)

Q: Draw for me, if you would, if you can[,] where in your opinion the screw holes should have been placed in this nail? Can you do that?

A: No.

Q: Can you describe for me? Can you tell me?

A: Closer to the proximal tip.

. . . . .

Q: And again, if you had the screw holes placed further away from the distal end ... do you have an opinion or any knowledge as to whether or not that would enable a surgeon to stabilize the bone fragments?

A: No opinion.

(Townsend Dep. at 99—100.)

Q: And do you think that—by making it four times stronger, it would have been able to maintain its versatility and flexibility and the biological compatibility?

A: As I said, I'm not qualified to make those opinions.

(Townsend Dep. at 126.)

Without evidence of a feasible design alternative or that the requisite risk-utili-ty analysis has been conducted, plaintiff cannot establish this required element of product defect as a matter of law. Since plaintiff has failed to proffer expert testimony sufficient to permit a jury to conclude that the Nail was defective and unreasonably dangerous, defendant is entitled to summary judgment on plaintiff's sole strict liability claim.

### b. Proximate Cause

 In addition to having no evidence that the Nail was defective and unreasonably dangerous, plaintiff has no evidence that the Nail was the proximate cause of his alleged injuries. In a products liability action, a plaintiff must "not only show that the product was defective, but that the defect was the direct and efficient cause of plaintiff's injury." *Livingston v. Noland Corp.,* 293 S.C. 521, 524, 362 S.E.2d 16, 18 (1987). Plaintiff has come forward with no evidence to meet his burden of proof on this issue.

 As with the issue of defective design, plaintiff must establish proximate cause through competent expert testimony. *See Goewey v. United States,* 886 F.Supp. 1268, 1279 (D.S.C.1995) ("Where a medical causal relation issue is not one within the common knowledge of the layman, proximate cause cannot be determined without expert medical testimony"). The need for expert medical testimony is particularly apparent in this medically complex case, where plaintiff's lack of bone healing and resulting nonunion were effected by such diverse factors as his morbid obesity, the environment, the type and severity of the initial bone fracture, his nutritional status and other issues. (Ladd Dep. at 15.) For this reason, other courts considering similar claims concerning bone fixation devices have noted the require-

ment of expert testimony to prove causation.[3]

 Additionally, under South Carolina law, proffered expert testimony on the causal connection between a plaintiff's alleged injuries and a defendant's product must meet the "most probably" standard in order to satisfy a plaintiff's burden on causation. *See Baughman v. Am. Tel. and Tel. Co.*, 306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991). Thus, in order to survive summary judgment on the causation issue, plaintiff must not only proffer the testimony of a competent medical expert, but the testimony of a competent medical expert who will "testify . . . that the result in question most probably came from the cause alleged." *Id.*

Plaintiff has failed to come forward with any expert medical testimony on the issue of proximate cause, much less any expert testimony that meets the "most probably" standard of certainty. Dr. Townsend, by his own admission, is a metallurgist, not a medical doctor; he did not attempt to offer any medical testimony as to the cause of plaintiff's healing problems or as to role of the Nail from a biomedical standpoint. Therefore, plaintiff has no expert testimony that would carry his burden of proof on the issue of proximate causation. Moreover, the uncontradicted testimony of the only proffered medical experts in this case make it clear that the breakage of the Nail was, in fact, not the cause of plaintiff's injuries. (Ladd Dep. at 17; Hartsock Aff. ¶¶ 11–12; Dalton Aff.¶¶ 9–11.)

Because plaintiff has not produced any competent medical testimony to demonstrate that the Nail was the proximate cause of his injuries, plaintiff's claim for strict liability must fail.

### IV. Conclusion

For the reasons set forth above, it is therefore **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**.

---

**3.** "Expert testimony is required where the claimant is attempting to establish causation of a medically complex situation." *Jones v. Danek Med., Inc.*, No. 96–3323–12, 1999 WL 1133272 at *4 (D.S.C. Oct. 12, 1999) (granting summary judgment on products liability claim against bone fixation device due to lack of expert testimony regarding causation). *See also Minisan v. Danek Med., Inc.*, 79 F.Supp.2d. 970, 976 (N.D.Ind.1999) (noting that "proof of legal causation must be by expert testimony").