Michael J. PHILLIPS and Vickie Phillips, Plaintiffs,

v.

MORBARK, INC., Defendant.

C.A. No. 9:05–2446–PMD.

United States District Court,
D. South Carolina,
Beaufort Division.

Jan. 5, 2007.

---

Gregory P. Sloan, Phillip Earl Reeves, Richard S. Stewart, Gallivan White and Boyd PA, Greenville, SC, for Plaintiffs.

Curtis L. Ott, Turner Padget Graham and Laney, Columbia, SC, Kevin G. Dougherty, Warner Norcross and Judd, Grand Rapids, MI, for Defendant.

### ORDER

DUFFY, District Judge.

This matter is before the court upon Defendant Morbark, Inc.'s ("Defendant" or "Morbark") Motion for Partial Summary Judgment on Plaintiffs' defective remote control claims. For the reasons set forth

herein, the court denies Defendant's motion.

## BACKGROUND

On March 15, 2003, Plaintiff Michael J. Phillips ("Plaintiff") was injured while using the Morbark Model 4600 Wood Hog, which is a wood grinding machine. The Morbark Model 4600 Wood Hog had a remote control, and the remote control had seven toggle switches that controlled various functions of the wood grinder. The remote had a power switch, which controlled power to the remote control device itself, and an "engine stop" switch, but it did not have an emergency stop switch. Furthermore, the remote's "engine stop" switch had a two or three second time delay such that the switch had to be held down for two or three seconds before it would begin to activate. All of the switches on the remote control were exactly alike in shape, size, and color.

On March 15, after he finished grinding wood, but while the engine and conveyors were still running, Plaintiff attempted to clear away some debris that had built up around the sides of the area where the belly conveyor transfers ground debris to the stacking conveyor. As he did this, a portion of the debris caved in on his right hand, forcing it down into the nip point between the belly conveyor and the belt scraper. After his hand became caught, Plaintiff attempted to shut off the machine using the remote control he was wearing around his neck. Plaintiff asserts that he had difficulty shutting the engine off because the "engine stop" switch on the remote control was not differentiated from the other switches by shape or color and because of the delay between activating the switch and engine shut down.

Plaintiff suffered severe injuries to his right hand as a result of this accident, and on July 22, 2005, he brought suit against Morbark in the Court of Common Pleas, Hampton County. Plaintiff's Complaint listed the following causes of action: negligence, strict liability, breach of express warranty of merchantability, breach of implied warranties, negligent misrepresentation, and violation of the South Carolina Unfair Trade Practices Act. Morbark removed the action to this court on August 23, 2005, asserting jurisdiction pursuant to 28 U.S.C. § 1332.

On November 21, 2006, Morbark filed a Motion for Partial Summary Judgment on Plaintiff's defective remote control claims. In Defendant's Memorandum in Support of its motion, Defendant notes that Plaintiff claims the Morbark Model 4600 Wood Hog is defective because (1) the area where Plaintiff injured his hand was not guarded, (2) the remote control did not have a red, mushroom-shaped emergency stop button, and (3) there was no emergency stop button located on the Wood Hog within the reach of the conveyor area. Morbark moves for summary judgment with respect to the second and third alleged defects on the grounds that Plaintiff cannot prove the alleged defects caused his injuries. Defendant states, "Plaintiff's experts have admitted that [Plaintiff] still would have suffered his injury even if the remote control and emergency stop had been designed as they say it should have been." (Defendant's Mem. in Support at 1.) Plaintiff filed a Memorandum in Opposition to Defendant's Motion, to which Defendant filed a Reply.

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

### ANALYSIS

■ Defendant moves for Partial Summary Judgment on the grounds that Plaintiff cannot prove the alleged defects caused Plaintiff's injuries.[1] "A products liability plaintiff must prove the product defect was the proximate cause of the injury sustained. Proximate cause requires proof of both causation in fact and legal cause, which is proved by establishing

foreseeability." *Bray v. Marathon Corp.,* 356 S.C. 111, 116–17, 588 S.E.2d 93, 95 (2003) (citations omitted); *see also Livingston v. Noland Corp.,* 293 S.C. 521, 524, 362 S.E.2d 16, 18 (1987) (noting that in actions for strict liability and breach of implied warranty, "proof must be sufficient to show not only that the product was defective but that the defect was the direct and efficient cause of plaintiff's injury"). Even if the plaintiff would have suffered some injury if the product had not been defective, the defendant remains liable to the extent the defect increased the harm to the plaintiff. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 16(a).

■ In a products liability case, "[c]ausation based upon a possibility rather than a probability is not sufficient for a plaintiff to recover ..." *Harris v. Rose's Stores, Inc.,* 315 S.C. 344, 346, 433 S.E.2d 905, 907 (Ct.App.1993). If the plaintiff does not rely on an expert witness to establish proximate cause, "it is sufficient for plaintiff to put forth some evidence which rises above mere speculation or conjecture ..." *Armstrong v. Weiland,* 267 S.C. 12, 16, 225 S.E.2d 851, 853 (1976). On the other hand, if the plaintiff relies on a medical expert to establish causation, the "most probably" standard is appropriate:

> [W]hen the opinions of medical experts are relied upon to establish causal connection of negligence to injury, the proper test to be applied is that the expert must, with reasonable certainty, state that in his professional opinion the injuries complained of [m]ost probably resulted from the alleged negligence of the defendant.

*Id.* at 16, 225 S.E.2d at 853. In this case, as Plaintiff does not rely on medical experts to establish causation, Plaintiff must

---

**1.** Only two of the alleged defects are at issue in the present motion: (1) the lack of a red, mushroom-shaped emergency stop button on

the remote control and (2) the lack of an emergency stop button located on the Wood Hog within the reach of the conveyor area.

submit evidence showing the defects probably caused his injury.[2] *See Gambrell v. Burleson,* 252 S.C. 98, 101–02, 165 S.E.2d 622, 623 (1969); *see also Harris,* 315 S.C. at 346, 433 S.E.2d at 907.

In order to assess whether a genuine issue of material fact exists with respect to causation, the court will now review the relevant evidence.

## A. David Clement, Ph.D., Expert for Plaintiff

David Clement ("Clement"), one of Plaintiff's experts, issued an opinion dated April 19, 2006, and opined that the remote control should have had a red, mushroom-shaped "emergency stop" switch. (*See* Plaintiff's Exhibit E to Mem. in Opposition at 3.) For purposes of this motion, however, it is unnecessary to explore this portion of Clement's opinion as the court herein assumes the product was defective and instead looks to whether the defect caused

Plaintiff's injury. Clement's opinion provides some insight into causation:

In my opinion, to a reasonable degree of scientific certainty, effective guarding of the incident nip point, together with safer cleaning implements, procedures, or tactics, would have avoided this accident and injury; Provision of a true emergency stop adjacent to the nip point might have avoided an injury, and would have reduced the extent of the damage involved in this accident and injury. Likewise, provision of a true emergency stop button on the remote control might have avoided an injury, and would have reduced the extent of the damage involved in this accident and injury. The equipment, including the remote control, was unacceptable from a safety standpoint.

(Plaintiff's Exhibit E to Mem. in Opposition at 4.)

Clement was deposed on July 14, 2006, and he testified as follows:

---

2. Plaintiff did submit excerpts from the deposition of John S. Millon, M.D., in his Memorandum in Opposition to Defendant's Motion However, when Dr. Millon was asked whether Plaintiff's injuries were instantaneous or whether the injuries continued to worsen as the machine was grinding his hand, Dr. Millon stated, "I do not have enough information to answer that question." (Millon Dep. 23:5–23:10; Dec. 13, 2006.)

Even so, this court is of the opinion that Plaintiff is not required to produce expert medical testimony on the issue of causation. In *Disher v. Synthes (U.S.A.),* 371 F.Supp.2d 764 (D.S.C.2005), the United States District Court for the District of South Carolina noted,

As with the issue of defective design, plaintiff must establish proximate cause through competent expert testimony. *See Goewey v. United States,* 886 F.Supp. 1268, 1279 (D.S.C.1995) ("Where a medical causal relation issue is not one within the common knowledge of the layman, proximate cause cannot be determined without expert medical testimony"). The need for expert medical testimony is particularly apparent in this medically complex case, where

plaintiff's lack of bone healing and resulting nonunion were effected by such diverse factors as his morbid obesity, the environment, the type and severity of the initial bone fracture, his nutritional status and other issues.

*Disher,* 371 F.Supp.2d at 772 (citation omitted). *Disher* was a products liability action arising out of the fracture of a Titanium Humeral Nail used as a bone fixation device. *Id.* at 767.

The case *sub judice* is not a medically complex case like *Disher,* nor is it a medical malpractice action. *See Bramlette v. Charter-Medical-Columbia,* 302 S.C. 68, 72–73, 393 S.E.2d 914, 916 (1990) ("Generally, expert testimony is required to establish proximate cause in a medical malpractice case. Expert testimony is not required, however, to prove proximate cause if the common knowledge or experience of laypersons is extensive enough to determine the presence of the required causal link between the medical treatment and the patient's injury." (citation omitted)). Accordingly, Plaintiff must submit evidence on causation, but this evidence is not required to be in the form of expert medical testimony.

Q. So you would agree that there was probably some significant damage to [Plaintiff's] hand and finger within a matter of seconds of being caught?

A. I think there would be, yes, sir.

Q. Okay. And you don't know whether or not, even if he had hit that stop button or emergency button as quickly as he could, as quickly as humanly possible, you don't know whether or not that damage would have been avoided?

A. That's correct.

. . .

Q. [referring to the portion of Clement's written opinion excerpted above] Let's start with the might have. I think it's down on the fourth line you talk about having an E-stop adjacent to that area might have avoided the injury . . . So might have, that it might have avoided the injury, you are speculating there. And you really don't have any firm basis for whether or not this injury would have been avoided?

A. Speaking to him specifically, that is correct.

Q. Okay. And similarly when you go in on that same sentence and you say would have reduced the extent of the damage involved, you don't really know that either, do you? I mean, all of the damage that was done, as you indicated, could have been done in a matter of seconds?

A. That is true. And I don't know.

Q. Okay. Would you agree that that probably—that that would have—that you have there in the 1, 2, 3, 4th line probably should be changed to might have?

A. No. And the reason I used would have there is that we are not just talking about say two or three seconds versus five seconds.

Let's say his hand is caught in there and he's absolutely unable to bring that equipment to a halt. And there is no one nearby, and he stays entrapped there for a couple three or four minutes. He might well bleed out before any help could come.

And so being able to stop it and shut it down any amount of time that is less mitigates the damage. The problem is I can't say whether, you know, like the old joke of alternatives, of bad things happening to you. Somebody might not really care that much between losing a hand and losing half of the hand.

Q. You can't say with any degree of certainty whether or not the injury that he ultimately received would have been less if he had been able to hit an emergency stop?

A. That is correct.

. . .

Q. So it's possible that [Plaintiff] may have ended up receiving the same injury that he ultimately received even if there was a red mushroom stop button on the remote control and on the machine immediately adjacent to that area.

A. That is correct. Or I guess more accurately, I don't know.

(Clement Dep. 54:9–58:12; July 14, 2006.)

Examining Clement's written opinion and his deposition testimony as a whole, Clement has not testified that the alleged defects at issue in this motion probably caused Plaintiff's injury. Clement does not testify that Plaintiff would have suffered no injury if these alleged defects had not been present, but he does testify that "being able to stop [the machine] and shut it down any amount of time that is less

mitigates the damage." (Clement Dep. 56:25–57:2; July 14, 2006.) However, Clement acknowledges that he is not able to say with any degree of certainty whether or not Plaintiff's injury would have been any less had Plaintiff been able to hit an emergency stop. (Clement Dep. 57:8–57:12; July 14, 2006.) Standing alone, the evidence from Clement does not raise a genuine issue of material fact as to causation.

## B.  Bryan R. Durig, Ph.D., Expert for Plaintiff

Summit Engineering, L.L.P. issued a written report dated March 2, 2006, and presumably Plaintiff's expert Bryan R. Durig ("Durig") authored this report. (*See* Plaintiff's Mem. in Opposition at 4.) The "summary" section of that report states,

> In summary, [Plaintiff] was injured when his hand was pulled into an ingoing nip point between the belly conveyor and the beginning portion of the stacking conveyor. There were no guards to prevent an operator from getting his hand in the area of the hazardous nip point. There were no Emergency Stop buttons in the area of the ingoing nip point. The wireless remote control device is considered defective and unreasonably dangerous due to its lack of an emergency stop button. The Engine Stop switch is not differentiated from any other switch and the Power On/Off switch only turns the wireless remote control device OFF making all other switches inoperative. The defective and unreasonably dangerous conditions of the Morbark Wood Hog Model 4600 are the proximate cause of [Plaintiff's] accident and subsequent injuries.

(Plaintiff's Exhibit C to Mem. in Opposition at 4.)

As a preliminary matter, Durig's written report is not much help in determining whether Durig opines the alleged defects at issue in this motion caused Plaintiff's injuries. The written report points out several alleged defects in the Morbark Model 4600 Wood Hog, and the report states that the "defective and unreasonably dangerous conditions" of the wood grinding machine "are the proximate cause" of Plaintiff's injuries. (Plaintiff's Exhibit C to Mem. in Opposition at 4.) As the report clumps all alleged defects together, only two of which are at issue in the present motion, the written report does not help establish the two defects at issue probably, rather than merely possibly, caused Plaintiff's injuries.

Durig was deposed on October 6, 2006, and he testified as follows:

Q.  So his hand was pulled in and caught in less than a second?

A.  I would expect it to be that quick, yes.

. . .

Q.  And I take it he would've had significant damage to his finger within a matter of seconds?

A.  He'd have damage, but typically what happens in these kind of cases is the belt continues to go over, you'll get friction burns and heat up and do thermal damage as well. You're going to get crushing damage as soon as it goes through this. The extent of how bad it is, and I understand he had some infections, that would all play a role into how long it was in there.

Q.  Did he tell you how long his hand was in there before he was able to shut the machine off?

A.  I don't think he had a timeframe. I know he tried to shut the machine off several times and couldn't do it. Whether that was a second, five seconds, ten seconds, I don't know.

Q. And do you know how long it took before enough damage was done to his finger and hand to where it would've had to been amputated?

A. No, sir.

. . .

Q. If hypothetically there had been an Emergency Stop button on the remote control or within the reach of [Plaintiff's] left hand, do you know how long it would've taken him from the time he got caught and realized he was caught, to hit that button, and for that button to shut the machine down and stop the belt?

A. I don't know exact time, but I know it would be quicker than what he was able to do because he was not able to get the remote to shut down, but obviously respond quicker than a two second delay. Then once—once you got that electrical circuit impulse going over to the controls to shut off, then I would expect it to slow down at the same rate.

Q. Do you know how much time it would've taken?

A. To shut down; no, sir.

. . .

Q. Would you agree with me that even if that remote control had had an Emergency Stop button, or there was an Emergency Stop button on the machine where he could reach it, that he still may have suffered a significant injury to his hand?

A. Yes.

(Durig Dep. 56:8–64:17; Oct. 6, 2006.)

Durig's deposition testimony provides some evidence that Plaintiff's injuries would be less severe had the alleged defects not existed. When asked whether Plaintiff suffered "significant damage" within a matter of seconds, Durig replied, "He'd have damage, but typically what happens in these kind of cases is the belt continues to go over, you'll get friction burns and heat up and do thermal damage as well." (Durig Dep. 57:1–57:4; Oct. 6, 2006.) Durig does state that even if the alleged defects at issue not existed, Plaintiff "still may have suffered a significant injury to his hand." (Durig Dep. 64:12–64:17; Oct. 6, 2006.) This testimony does not indicate, however, that Durig opines Plaintiff's injury would have been as severe even if the alleged defects had not existed. Durig's testimony thus provides some evidence that Plaintiff's injury probably would have been less severe had the alleged defects at issue not existed.

## C. Plaintiff's Testimony

Plaintiff was deposed on July 13, 2006. The following are the relevant portions of his testimony:

Q. How long did it take you from the time your hand got caught to the time that you shut—that you hit the power button to shut off—which shut off the remote?

A. I mean, I don't have any idea, but I will tell you how it happened. When it grabbed me my first thing was just trying to jerk my hand out or pull on it or anything.

Q. That was the first thing you did?

A. I mean, I put my foot up against the machine. I was trying to pull my arm off. I thought it was going to literally eat me. If I could have reached over and got an ax or something I would have chopped my arm off. And then it was just—it was just eating me alive. And so I—you know, I'm telling you I was freaked out. Ain't no ifs, ands, and buts about it.

Q. Well, it's understandable.

A. So then I started trying to get the control to work.

Q. Hold on a second. How long did you try to get your hand or arm out before you went for the remote?

A. I don't know. I have no idea.

. . .

Q. I understand. Did it [(Plaintiff's hand)] go in to the full extent that it got in almost immediately or was it a process of being pulled in slowly?

A. Oh, it just—it was not immediate, but it pulled in fairly quickly as it—

Q. Fairly quickly meaning a couple of seconds?

A. I don't know. I mean, somebody jumps out and grabs you out of the dark, you know, how do you remember time? I mean—

. . .

Q. I understand. My question is I'm trying to figure out whether this was, you know, a process where your hand is slowly going in further and further and further and further while—

A. It's not that slow.

Q. Okay. It pretty much went in, stuck, and was in there to the full extent?

A. Yeah. It was just—it had me in there and like my thumb was like the stop on it, I guess, or something, but anyway that is where it went back to.

. . .

Q. And it sounds like it got in that far to the extent that it got in pretty quickly?

A. I don't have no idea on time. I just know that it grabbed me, and it was just eating me. So—

Q. Was it in there all the way before you had a chance to hit the remote?

A. Yeah. See, and I couldn't reach any other emergency shutdowns.

(Pl.'s Dep. 116:2–119:5; July 13, 2006.)

When Plaintiff filed his Memorandum in Opposition to Defendant's Motion for Partial Summary Judgment, Plaintiff attached his affidavit as an exhibit. The following are excerpted paragraphs from Plaintiff's affidavit:

4. Although he is not aware of precisely how long he attempted to shut down the grinder with the remote control unit before it finally worked, his right hand was being continually ground, scraped, and otherwise injured throughout the entire period. He recalls feeling the grinder burning the leather glove from his hand, burning and scraping the flesh from his fingers and hand, and otherwise injuring him from the time his hand was introduced into the machine until the time when he was finally able to activate the engine stop switch on the remote control unit and stop the grinder.

. . .

6. He experienced injuries to his hand, as well as severe pain and suffering, from the time his hand was introduced into the defendant's wood grinder until the time the engine stop switch on the remote control unit was activated.

7. He is certain that, had he been able to shut down the grinder with the remote control unit when he first attempted to do so, his injuries would not have been as severe and he certainly would not have experienced as much pain and suffering as he ultimately did.

(Pl.'s Aff. ¶¶ 4–7.)

■ Plaintiff's affidavit reveals that a genuine issue of material fact exists regarding causation. Although in his deposition he seems to indicate his injury occurred very quickly, his affidavit reveals

he felt the machine scraping the flesh off his hand from the moment it went into the machine to the moment the engine stopped. The evidence in Plaintiff's affidavit helps establish the alleged defects at issue in this motion probably caused his injury or increased the injury he suffered. However, Defendant argues the court should not consider the affidavit, asserting Plaintiff "had the opportunity to offer this testimony during his deposition when he was asked a series of questions regarding the accident" but "chose instead to offer vague, evasive and unresponsive testimony." (Defendant's Reply to Plaintiff's Opposition at 3.) Defendant states that "[c]ourts have stated with virtual unanimity that a 'late-conceived affidavit' does not create a genuine issue of material fact sufficient to survive a summary judgment motion where the affidavit goes against the witness's prior sworn testimony." (Defendant's Reply to Plaintiff's Opposition at 4.)

■ This court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However,

"[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.

*Rohrbough v. Wyeth Labs. Inc.*, 916 F.2d 970, 975 (4th Cir.1990) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)); *see also Cleveland v. Policy Mgmt.*

*Sys. Corp.*, 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (noting that courts "have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity").

In *Rohrbough*, a doctor was asked whether he had an opinion regarding the cause of the plaintiff's injuries, and the doctor stated, "My opinion is that following the second immunization shot that she received, that the manifestations that she subsequently demonstrated were consistent with those which have been repeatedly demonstrated in the literature to be associated with a reaction to the pertussis component of DPT." 916 F.2d at 974. The lower court stated that this testimony only established a "*temporal* link ... between the vaccine and a reaction like that displayed by [the plaintiff]," not a "*causal* link." *Id.* When the plaintiff responded to the defendant's motion for summary judgment, however, the plaintiff attached an affidavit of this same doctor, which stated, "It is my opinion that the DPT vaccine administered to [the plaintiff] ... caused the neurological injuries from which she has suffered and continues to suffer." *Id.* at 974–75. The Fourth Circuit held the district court was justified in disregarding the affidavit because his "deposition contrasts starkly with his affidavit" and because the "affidavit is very nearly entirely conclusory and devoid of specific facts to support his opinion." *Id.* at 975–76.

This court is of the opinion that Plaintiff's affidavit does not contrast starkly with his affidavit, nor is Plaintiff's affidavit nearly entirely conclusory and devoid of specific facts. Simply because Plaintiff

testified at his deposition that his hand went all the way into the wood grinding machine very quickly does not mean that Plaintiff suffered no further injury as the engine continued to run while he was attempting to shut it down. If a contrast exists between his deposition testimony and his affidavit, it is not, in the court's opinion, a stark contrast. Furthermore, Plaintiff's affidavit is not entirely conclusory; Plaintiff's affidavit does not simply state that the alleged defects at issue in this motion caused his injuries. Rather, Plaintiff states in the affidavit that he felt his flesh being burned and scraped from his hand from the moment his hand entered the machine until the moment the engine shut off. (Pl.'s Aff. ¶ 4.) This testimony provides evidence that had the alleged defects at issue not existed, Plaintiff would have suffered a less severe injury. Considering Plaintiff's deposition testimony and affidavit, along with the opinions and deposition testimony of both Clement and Durig, a genuine issue of material fact exists, and summary judgment must be denied.

### CONCLUSION

It is therefore **ORDERED**, for the foregoing reasons, that Defendant's Motion for Partial Summary Judgment is **DENIED.**

**AND IT IS SO ORDERED.**